# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 20

*October Term, A.D. 2021*

*February 2, 2022*

| | |
|---|---|
| **BOARD OF PROFESSIONAL RESPONSIBILITY, WYOMING STATE BAR,**<br><br>Petitioner,<br><br>v.<br><br>**HAMPTON M. YOUNG, WSB #6-3672,**<br><br>Respondent. | D-21-0004 |

## ORDER OF ONE-YEAR SUSPENSION

[¶ 1]   **This matter** came before the Court upon the Board of Professional Responsibility's Report and Recommendation for One-Year Suspension, filed herein January 24, 2022. The Report and Recommendation was filed pursuant to Rule 12 of the Wyoming Rules of Disciplinary Procedure, which governs stipulated discipline. Now, after a careful review of the Report and Recommendation and the file, the Court finds the Report and Recommendation should be approved, confirmed, and adopted by the Court, and that Hampton M. Young should be suspended from the practice of law for one year. It is, therefore,

[¶ 2]   **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's Report and Recommendation for One-Year Suspension, which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶ 3]   **ADJUDGED AND ORDERED** that, as a result of the conduct set forth in the Report and Recommendation for One-Year Suspension, Respondent Hampton M. Young shall be, and hereby is, suspended from the practice of law for one year, with the period of suspension to begin February 4, 2022; and it is further

[¶ 4]   **ORDERED** that, during the period of suspension, Respondent shall comply with the requirements of the Wyoming Rules of Disciplinary Procedure, particularly the requirements found in Rule 21 of those rules.  That rule governs the duties of disbarred and suspended attorneys; and it is further

[¶ 5]   **ORDERED** that, pursuant to Rule 25 of the Wyoming Rules of Disciplinary Procedure, Respondent shall reimburse the Wyoming State Bar the amount of $50.00, which represents the costs incurred in handling this matter, as well as pay an administrative fee of $750.00.  Respondent shall pay the total amount of $800.00 to the Wyoming State Bar on or before April 1, 2022.  If Respondent fails to make payment in the time allotted, execution may issue on the award; and it is further

[¶ 6]   **ORDERED** that the Wyoming State Bar may issue the agreed press release contained in the Report and Recommendation for One-Year Suspension; and it is further

[¶ 7]   **ORDERED** that the Clerk of this Court shall docket this Order of One-Year Suspension, along with the incorporated Report and Recommendation for One-Year Suspension as a matter coming regularly before this Court as a public record; and it is further

[¶ 8]   **ORDERED** that, pursuant to Rule 9(b) of the Wyoming Rules of Disciplinary Procedure, this Order of One-Year Suspension, along with the incorporated Report and Recommendation for One-Year Suspension shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶ 9]   **ORDERED** that the Clerk of this Court cause a copy of this Order of One-Year Suspension to be served upon Respondent Hampton M. Young.

[¶ 10]  **DATED** this 2nd day of February, 2022.

**BY THE COURT:**

/s/

**KATE M. FOX**
**Chief Justice**

## BEFORE THE SUPREME COURT

## STATE OF WYOMING

|  |  |  |
|---|---|---|
| *In the matter of* | ) | **D-21-0004** |
| *HAMPTON M. YOUNG* | ) | |
| *WSB # 6-3672,* | ) | *WSB No. 2021-004* |
| | ) | |
| *Respondent.* | ) | |

## REPORT AND RECOMMENDATION FOR ONE-YEAR SUSPENSION

THIS MATTER came before a Review Panel of the Board of Professional Responsibility via video conference call on the 18th day of January 2022 for consideration of the parties' Stipulation for One-Year Suspension pursuant to Rules 9 and 12 of the Wyoming Rules of Disciplinary Procedure. Present on the call were Review Panel members Robert C. Jarosh, Jeffrey A. Donnell and Tandy Dockery. Mark W. Gifford, Bar Counsel, appeared on behalf of the Wyoming State Bar. Respondent Hampton M. Young appeared on his behalf. The Review Panel, having reviewed the Stipulation and the supporting Affidavit, and being fully advised in the premises, finds, concludes, and recommends:

### FINDINGS

1.     Respondent Hampton M. Young is a licensed attorney in the State of Wyoming, Bar # 6-3672. Respondent has been licensed to practice in Nevada since 1978 and in Wyoming since 2005. Until recently, Respondent maintained an active practice of law in Casper, Wyoming.

1

2.      Late in 2020 the trial of Respondent's divorce from his wife was held before the Hon. Dawnessa Snyder. During the trial, Respondent's legal assistant, Natalie Benson, testified regarding various matters, including Respondent's law office trust account.

3.      In January 2021, Judge Snyder reported her concerns about apparently improper disbursements from the trust account to the Office of Bar Counsel (OBC). Potentially improper transactions identified by Judge Snyder included several disbursements from the trust account to Benson directly.

4.      Respondent was sent a letter of inquiry from the OBC dated January 25, 2021, enclosing Judge Snyder's report, and inquiring as to possible violations of Rule 1.15 (law office trust account) and Rule 5.3 (failure to adequately supervise nonlawyer assistant). The letter asked Respondent to produce all records required by Rule 1.15(g) for the period 2016 to present.

5.      Respondent did not fully nor timely cooperate with the OBC's request. The initial inquiry from OBC asked for Respondent's written response by February 8, 2021. Respondent requested and was granted an extension until February 22, 2021. On February 22, 2021, Respondent's assistant, Natalie Benson, sent an email to OBC requesting an additional extension to March 15, 2021. The OBC granted the request. When Respondent's response was not submitted by March 15, 2021, Bar Counsel sent an email advising that if the response was not received by March 19, 2021, Bar Counsel would file a petition for Respondent's immediate suspension with the Wyoming Supreme Court.

6.      In Respondent's written response dated March 19, 2021, Respondent told the OBC that since the inception of Respondent's office, his merchant business deposits via

2

credit card were set up to be automatically deposited in his trust account. Respondent admitted to the OBC, "This was an oversight on my part, which was apparent to me as a result of my divorce trial. The deficiency was corrected last month." Respondent further acknowledged that certain direct payments were improperly made from his trust account to his legal assistants. Respondent stated, "Regardless, it is my responsibility to ensure all trust account transactions are made correctly." Included with Respondent's response were copies of Hilltop National Bank statements for his trust account for the period January 2016 through December 2019.

7. The next correspondence from OBC to Respondent came in the form of a letter dated April 7, 2021, from Melinda McCorkle, Deputy Bar Counsel. The letter began:

> I have reviewed your March 19, 2021 response to Mark Gifford's January 25, 2021 inquiry. Based upon your response and accompanying documents, I am concerned that your IOLTA Trust Account has been utilized as an operating account. Consequently, there is no ability to delineate between funds belonging to clients and third parties that are required to be held in trust, funds that were appropriately transferred to the operating account once fees were earned or costs expended, and funds used to operate your business. In other words, it appears that client funds relating to fees that you had not yet earned were used to fund your business or personal expenses, which is tantamount to stealing. This practice constitutes a cardinal violation of the Rule 1.15 prohibition against commingling of funds, and exposes money belonging to clients to the claims of your creditors.
>
> I am further concerned that you do not seem to understand the gravity of this situation. Your two-page letter states that there were two trust account transactions on behalf of both Ms. Benson and Tami Studer. This is disproven on the following page, which identifies seven transactions on behalf of Ms. Benson. Similarly, page 28 alone of the "Check Detail" provided contains four transactions to Ms. Studer. Your letter also states that your "merchant business deposits via credit card" has automatically deposited funds into your trust account since the inception of your business. None of those uses are appropriate for a trust account. I encourage you to review Rule 1.15 and the Wyoming State Bar's Trust Account Handbook, available as a free

3

download on the Bar's website at https://www.wyomingbar.org/for-lawyers/lawyer-resources/trust-account-information/.

Along those lines, Mr. Gifford's letter expressly requested "copies of all records relating to your trust account that are required to be maintained pursuant to Rule 1.15(g) for the period 2016 to present." Although you provided bank statements and a report generated by your office, you did not provide all records required by Rule 1.15(g).

Ms. McCorkle's letter concluded:

> Please provide all documents identified in Rule 1.15(g). Please also provide the following:
>
> 1. A copy of the "Check Detail" report (pages 1-54) identifying all transactions in <u>date</u> order. The state of the report provided makes it extremely difficult to compare each transaction to the accompanying bank statement.
>
> 2. Copies of all 2016-present statements from the "business account" identified in your March 19, 2021 letter.
>
> 3. Copies of additional 2016-present statements from other operating or trust accounts, if any.
>
> 4. Federal income tax returns from 2016-present.
>
> 5. A copy of the "self-report" email (Exhibit 2) identifying the date on which the email was sent. None of the emails provided contain a date or time stamp. At a minimum, the bounce-back email received will contain a date and time stamp.
>
> 6. Identify all accounts on which you are an account holder, including the trust and business account identified above, stating:
>    a. The name and address of the institution;
>    b. The full account number; and
>    c. The purpose of the account.

Mr. Gifford's January 25, 2021 letter required a response by February 8, 2021. While our office agreed to two extensions of time, your response was still overdue. **Due to the seriousness of this issue, we require a response to this inquiry by Friday, April 23, 2021.** No extensions will be granted. Failure to timely provide the requested information and documents will

4

require me to file a request for an immediate suspension pursuant to Wyoming Rule of Disciplinary Procedure 17, as I am gravely concerned about the risks you are improperly imposing upon your clients.

8. Respondent responded to Ms. McCorkle's requests with a letter dated April 23, 2021, with which Respondent transmitted copies of a check detail report identifying all trust account transactions in date order, copies of statements from Respondent's operating account, and copies of federal income tax reports from 2016 to present.

9. Respondent next received a letter from Ms. McCorkle dated May 6, 2021, requesting copies of the following documents by May 17, 2021:

- The individual ledgers for each client whose funds went into Respondent's trust account showing date of deposit, date of withdrawals, descriptions and charges, and fee agreements. Rule 1.15(g) requires Respondent to maintain such individual ledgers.
- Records relating to electronic transfers, including the name of the person authorizing the transfer, date of transfer, name of recipient and confirmation from the financial institution that the transfer was completed. Rule 1.15(g) requires Respondent to maintain such records.
- All transactions in which either of Respondent's legal assistants, Natalie Benson and Tammy Studer, withdrew or deposited money into Respondent's trust account, the purpose of the withdrawal or deposit, and the client to whom each such withdrawal relates.

10. On May 25, 2021, Respondent wrote to Ms. McCorkle and requested an extension of the deadline to provide the requested information. Respondent admitted that he had not maintained a ledger documenting all trust account transactions. Respondent provided certain information regarding bankruptcy clients since February 2017, and explained that it would be necessary to pull the requested information from bank statements, individual credit card receipts, and hand-written receipt books, a very time-consuming endeavor.

5

11.     On May 27, 2021, Deputy Bar Counsel petitioned the Wyoming Supreme Court for Respondent's immediate suspension pursuant to Rule 17, W.R.Disc.P. In the petition, Ms. McCorkle cited Respondent's inability to produce the records required by Rule 1.15(g) and the fact that Respondent had clearly commingled client trust funds with funds held in Respondent's operating account over an extended period of time. The petition further alleged:

> Based upon the documents Respondent has provided, and as evidenced by the Affidavit of Deputy Bar Counsel, it is clear Respondent has repeatedly commingled his funds with client funds in his Trust Account and converted client funds for his own use. Since at least 2016, Respondent has deposited payments from clients into his Trust Account while simultaneously using his Trust Account to pay invoices and firm obligations unrelated to client services. On July 13, 2017, and July 26, 2017, Respondent's paralegals, Natelina Benson and Tami Studer, received payment advances totaling over $5,000.00 from Respondent's Trust Account. Between August 31, 2018 – December 31, 2019, Ms. Benson deposited seven personal checks into the Trust Account that purportedly paid back a loan from Respondent's firm to Ms. Benson. Ms. Benson has repeatedly reimbursed herself for "filing fees" from the Trust Account. Respondent has made payments to Sam's Club, Capital One, Pitney Bowes, and Signapay (merchant bankcard fees) from his Trust Account that appear to be unrelated to specific clients.
>
> On March 19, 2021, Respondent admitted that his "merchant business deposits via credit card was set to automatically deposit into [his] trust account" since the inception of his business. He acknowledged that "[i]t should have been set up so that I could delineate deposits to either my trust account or my business account. This was an oversight on my part, which was made apparent to me as a result of my divorce trial. Ths [sic] deficiency was corrected last month."
>
> On May 6, 2021, the undersigned again requested the Rule 1.15(g) records, and in particular, a ledger reflecting the flow of income and payments for each client with money in the Trust Account. To ascertain whether client funds had been properly placed in the Trust Account, i.e., whether the funds were unearned advance fees or otherwise clients' property, the undersigned requested representation agreements for the clients with money in the Trust Account. The undersigned also asked Respondent to identify all Trust

6

Account transactions in which Natalie Benson and Tami Studer deposited or withdrew money on their own behalf. The undersigned further requested an accounting of each client's money in the Trust Account for whom Ms. Benson was reimbursed for "filing fees" and similar transactions.

Respondent provided none of this information. Rather, Respondent provided standard Representation Agreements and fees for bankruptcy clients, none of which identified an actual client. He further produced an "internet payment history" ledger for some clients, none of which identify whether the funds were placed in the Trust Account or the Operating Account. Finally, he provided invoices that primarily reflect flat fees and costs. None of this information allows the Office of Bar Counsel to trace the client funds that flowed in and out of Respondent's Trust Account. In his May 25, 2021 response again requesting more time to compile information that should have been readily available pursuant to Rule 1.15(g), Respondent stated, "I have not kept a ledger which documents all trust transactions for the time frames requested... the information requested is being painstakingly reconstructed." Respondent asserted that the "information [requested] must be pulled from bank statement records, each individual credit card receipt, and hand written [sic] receipt books, specifically between January 1, 2016 to February 2, 2017." Consequently, he could not even provide information related to Ms. Benson's or Ms. Studer's Trust Account transactions.

At this time, it is unclear whether all of the funds deposited into the Trust Account were advanced, unearned fees. This seems unlikely. Regardless, Respondent has undoubtedly commingled client funds with his own funds. It appears Respondent has been utilizing his Trust Account as an Operating Account since perhaps the inception of his practice, despite having a separate Operating Account. Respondent seemingly has no understanding of the proper use of a Trust Account or the requirements stated in Rule 1.15. He undoubtedly has not maintained the records required by Rule 1.15(g). It appears he lost control of his Trust Account years ago.

Respondent's nonlawyer assistant and former assistant, Ms. Benson and Ms. Studer, are either ignorant of a lawyer's professional obligations relating to trust accounts or willfully ignored those obligations.

Although the Office of Bar Counsel's record contains 1796 pages, most of which are bank statements, it is impossible for Deputy Bar Counsel to trace the flow of client funds in and out of the Trust Account without the preceding information. It is unlikely that such a flow can be reconstructed. This concern is further validated by the passage of four months since the request for records maintained pursuant to Rule 1.15(g).

7

It is apparent Respondent's Trust Account has been mishandled. Unearned client funds have been commingled with Respondent's funds and have been utilized to fund his law firm, which is tantamount to stealing. Because this is an issue of public and client protection, the Office of Bar Counsel has no choice but to request an Order of Immediate Suspension.

A formal charge has not yet been filed in this case. While Deputy Bar Counsel requires additional information and documents to finalize a charging document, the impetus for this request is the immediacy of the potential public and private harm in light of Respondent's recent affirmation that he does not have a ledger tracing his clients' funds. Deputy Bar Counsel intends to file a formal charge alleging violations of Rule 1.15. Deputy Bar Counsel may amend the formal charge upon receipt of information and documents Respondent has not yet provided, which may include a violation of Rule 5.3 and Rule 8.1(b).

12. On June 14, 2021, Respondent filed a response to the petition for immediate suspension, advising the Court that he was working diligently to provide the requested records but that he was also operating a busy practice. Respondent apologized for his slow and cumbersome response. Respondent urged the Court to deny the petition for immediate suspension, citing the absence of evidence produced to date indicating that client funds were converted to Respondent's own use, and the impact his immediate suspension would have on Respondent's current clients and pending cases.

13. On June 22, 2021, the Court issued an order denying the petition for immediate suspension.

14. On July 19, 2021, the OBC issued a document subpoena to Wells Fargo Bank seeking production of account statements relating to a checking account established in 2018 for the Marie Delphaine Kincheloe Estate, Probate No. 23293, Seventh Judicial District Court, Natrona County, Wyoming. The Kincheloe Estate probate was filed by

8

Respondent on September 1, 2016, after Marie Delphaine Kincheloe, the decedent, passed away on August 21, 2016. On September 27, 2016, Seventh Judicial District Court Judge Dan Forgey entered an order appointing Crystal Gonzalez as personal representative of the estate. On October 5, 2017, Respondent filed a motion to replace Crystal Gonzalez as personal representative with Natalie Benson, Respondent's legal assistant, alleging that Ms. Gonzalez "has failed, neglected and refused to maintain contact with counsel for the estate." On December 1, 2017, Judge Forgey entered an order appointing Benson as personal representative. On August 2, 2018, an estate checking account was opened at Wells Fargo Bank in Casper, with Benson as the signatory. A Rawlins Bank of Commerce cashier's check in the amount of $89,905.25 was deposited in the new Wells Fargo account, which was named, "Marie Delphaine Kincheloe Estate, Natelina R Benson, PREP." It was the records of this account for which the OBC issued a subpoena to Wells Fargo on July 19, 2021.

15.     The Kincheloe Estate checking account statements produced by Wells Fargo in response to the subpoena revealed that the account, which began with an opening balance of $89,905.25 on August 3, 2018, was depleted to a balance of $15,980.98 by October 31, 2018. Subsequent discovery confirmed that almost all withdrawals from the account were spent on Benson's personal shopping, and very little was paid to or for the benefit of the beneficiary of the Kincheloe estate, Troy Kincheloe, who was incarcerated at the time. Purchases made by Benson with money from the estate checking account included the following, all made on August 20, 2018:

| Walmart | $459.24 |
| ATM withdrawal | 300.00 |
| Maurice's (a women's clothing store) | 416.59 |

16. By the end of August 2018, Ms. Benson had purchased a $20,000.00 used Suburban with money from the account. In addition, the following purchases were made with money from the account on September 4, 2018:

| Kim's Fine Furniture (purchase of a bed) | $3,538.50 |
| Ulta (beauty products) | 863.71 |
| Verizon Wireless | 920.00 |
| Verizon Wireless | 560.00 |
| Verizon Wireless | 1,133.98 |
| Cellular Plus | 1,154.99 |
| Cellular Plus | 115.48 |

17. During the month of October 2018, Benson made personal purchases from Walmart in excess of $3,000.00, all from the Kincheloe estate checking account. Similar purchases were made at Macy's, Sam's Club, Target, Torrid (a plus-size clothing store) and other merchants. Benson paid a $500.00 doctor's bill, spent $1,250.20 on tags for personal vehicles and spent an additional $1,193.28 at Verizon Wireless, all with funds taken from the Kincheloe estate checking account.

18. In November 2018, Benson spent an additional $2,378.24 of estate money at Walmart. By the end of the month, there was just $110.81 remaining in the Kincheloe estate checking account.

19. On August 15, 2018, a Final Report Accounting and Petition for Complete Distribution was filed, signed by Respondent and Benson, in which Judge Forgey was asked to approve distribution of the $89,905.25 as follows: (1) $990.00 to pay a creditor's claim from Interim Healthcare; (2) $2,711.88 to Respondent's law office (comprised of

10

Respondent's statutory attorney fee of $2,148.11 and costs of $563.77); (3) $2,158.11 to Benson (comprised of Benson's statutory fee of $2,148.11 and costs of $10.00); and (4) the balance of $84,405.26 to the estate's heir, Troy Kincheloe. On September 7, 2018, Judge Forgey signed an order approving distribution of the estate and closing the matter.

20.     Respondent was unaware of Benson's theft of funds from the Kincheloe estate until Respondent attended Benson's deposition on August 9 and 10, 2021. During her deposition, Benson was presented with evidence (in the form of account statements the OBC had subpoenaed from Wells Fargo) of the funds she had withdrawn from the Kincheloe estate checking account and confessed to the fraudulent purchases. She testified that she made sure that Troy Kincheloe received all that he was entitled to. Benson produced a release of liability she had Troy Kincheloe sign confirming his receipt of all funds. Benson testified that she paid the funds over time using a $15,000.00 loan from her sister and a $14,000 Paycheck Protection Program (PPP) loan from the federal government. The rest was money she obtained from Respondent's operating and trust accounts. Benson also produced a ledger of payments she made to Troy Kincheloe which indicated that she had charged Kincheloe a "money management" fee of $5,000.00 and a $2,500.00 annual "flat fee" for tasks she performed for him.

21.     Also during Benson's deposition, Respondent learned for the first time that Benson had made additional, improper and unauthorized withdrawals of tens of thousands of dollars from Respondent's operating and trust accounts. In addition to being Respondent's legal assistant, Benson was Respondent's bookkeeper and entered all transactions for Respondent's operating and trust accounts in Quickbooks. Many of the payments to

11

Benson were booked into Quickbooks as "loans" or "advances" which Benson, without Respondent's authorization, wrote off at the end of a given year, hence forgiving the debt. As one example, Benson took $21,000.00 in "advances" from Respondent's operating account in November 2018. She took almost $11,000.00 in advances during August 2019. Respondent also learned during Benson's deposition that she failed to pay federal payroll taxes on paychecks she received from Respondent, resulting in an IRS lien on Respondent's accounts. On occasion, she wrote herself paychecks out of Respondent's trust account. At the conclusion of her deposition, Benson admitted that the money she had taken out of Respondent's practice the last few years dwarfed Respondent's income from the practice.

22. Following these revelations in Benson's deposition, and at OBC's insistence, Respondent secured all checks, all deposit slips, and changed the password on Respondent's operating and trust accounts. Respondent removed Benson from any bookkeeping or other record-keeping duties regarding Respondent's finances as well as Respondent's trust account. Respondent took immediate steps to assure that Benson no longer comes into possession of client funds or payments received from clients. Respondent took away Benson's key to Respondent's post office box and took steps to assure that all mail delivered to his office was opened by Respondent and not by Benson.

23. Fortunately, as best Respondent and OBC can determine, Respondent was the only victim of Benson's fraud. Though review of bank statements for Respondent's operating and trust accounts shows that the two accounts were hopelessly commingled

12

with little separation between the accounts, there is no evidence that any client was harmed by Benson's numerous defalcations.

24. Respondent conditionally admits that he committed gross violations of Rule 1.15 (safekeeping property belonging to clients or others) and Rule 5.3 (oversight of nonlawyer assistance). The Review Panel finds that there is clear and convincing evidence that Respondent violated these two rules.

25. The Review Panel finds that Respondent's systematic violation of Rule 1.15 (lawyer trust accounts) falls within Standard 4.1, "Failure to Preserve the Client's Property," of ABA Standards for Imposing Lawyer Sanctions ("ABA Standards"). The Review Panel finds that the presumptive sanction for Respondent's repeated violations of Rule 1.15 is a suspension.

26. The Review Panel further finds that Respondent's systematic violation of Rule 5.3 falls within ABA Standard 7.0, "Violations of Other Duties Owed as a Professional." The Review Panel finds that the presumptive sanction for Respondent's repeated violations of Rule 5.3 is a suspension.

27. With regard to Respondent's mental state in committing these violations, the parties have stipulated that Respondent's complete abdication of his professional duty of oversight of a nonlawyer assistant was so pervasive as to rise to the level of knowledge. The Review Panel so finds.

28. The parties have stipulated that Respondent's professional misconduct posed a significant risk of injury to Respondent's clients. The Review Panel so finds.

13

29.    The parties have stipulated that there are significant aggravating factors, including a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. The Review Panel so finds.

30.    The parties have further stipulated that the absence of a dishonest or selfish motive is a mitigating factor. The Review Panel so finds.

31.    Respondent has stipulated to a one-year suspension as an appropriate sanction for Respondent's violation of these rules. The Review Panel finds that a one-year suspension is an appropriate sanction for Respondent's misconduct.

32.    If the Court adopts the Review Panel's recommendation and issues an Order of Suspension in accordance herewith, the parties have agreed to the following press release:

> The Wyoming Supreme Court has issued an order of the disciplinary suspension of Hampton M. Young, formerly of Casper, for a period of one year. The order stems from Young's conduct in failing to maintain proper records regarding funds held in his lawyer trust account, an account in which client funds are required to be kept segregated from the lawyer's own funds, and in failing to appropriately supervise his nonlawyer assistant. Investigation of activities in Young's trust account revealed that funds in the account were routinely commingled with Young's own funds. Further, the investigation revealed that Young's legal assistant, who had been appointed to act as the personal representative in a probate matter being handled by Young, embezzled tens of thousands of dollars from the estate and then replaced those funds with money she embezzled from Young. The investigation revealed no evidence that any client was harmed by such conduct. The parties' stipulation for a one-year suspension of Young's license to practice law was approved by the Board of Professional Responsibility (BPR) of the Wyoming State Bar and was submitted to the Wyoming Supreme Court. In adopting the BPR's recommendation for a public censure, the Court ordered Young to pay an administrative fee of $750.00 and costs in the amount of $50.00 to the Wyoming State Bar.

14

## CONCLUSIONS OF LAW

33.     Rule 1.15, W.R.Prof.Cond., provides in pertinent part, "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." The effect of the rule is a blanket prohibition of commingling a lawyer's funds with those of the lawyer's client.

34.     Rule 5.3, W.R.Prof.Cond., provides:

Rule 5.3. Responsibilities regarding nonlawyer assistance.

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

15

35.     Rule 15(b)(3)(D), W.R.Disc.P., provides, "In imposing a sanction after a finding of misconduct by the respondent, the BPR shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions:"

> 1. Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
> 2. Whether the lawyer acted intentionally, knowingly, or negligently;
> 3. The amount of the actual or potential injury caused by the lawyer's misconduct; and
> 4. The existence of any aggravating or mitigating factors.

36.     ABA Standard 7.0, "Violations of Other Duties Owed as a Professional," provides:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from misrepresentation, or failure to report professional misconduct.
>
> 7.1     Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal system.
> 7.2     Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.
> 7.3     Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.
> 7.4.    Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.

16

37.    ABA Standard 7.0, "Violations of Other Duties Owed as a Professional," provides:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from misrepresentation, or failure to report professional misconduct.
>
> 7.1    Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another and causes serious or potentially serious injury to a client, the public or the legal system.
> 7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.
> 7.3    Reprimand [i.e., "public censure" under Rule 9(a)(3), Wyo.R.Disc.Proc.] is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.
> 7.4.    Admonition [i.e., "private reprimand" under Rule 9(a)(4), Wyo.R.Disc.Proc.] is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.

38.    The Preface to the ABA Standards includes the following discussion regarding mental state:

> The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which

17

failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

39.    Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

40.    ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1    *Generally*
       After misconduct has been established, aggravating and mitigating circum-
       stances may be considered in deciding what sanction to impose.
9.2    *Aggravation*
9.21   *Definition.* Aggravation or aggravating circumstances are any considerations
       or factors that may justify an increase in the degree of discipline to be im-
       posed.
9.22   *Factors which may be considered in aggravation.* Aggravating factors in-
       clude:
       (a) prior disciplinary offenses;
       (b) dishonest or selfish motive;
       (c) a pattern of misconduct;
       (d) multiple offenses;
       (e) bad faith obstruction of the disciplinary proceeding by intentionally fail-
           ing to comply with rules or orders of the disciplinary agency;
       (f) submission of false evidence, false statements, or other deceptive prac-
           tices during the disciplinary process;
       (g) refusal to acknowledge wrongful nature of conduct;
       (h) vulnerability of the victim;
       (i) substantial experience in the practice of law;
       (j) indifference in making restitution; and
       (k) illegal conduct, including that involving the use of controlled substances.

18

9.3   *Mitigation.*

9.31  *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32  *Factors which may be considered in mitigation.* Mitigating factors include:
   (a) absence of a prior disciplinary record;
   (b) absence of a dishonest or selfish motive;
   (c) personal or emotional problems;
   (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
   (e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;
   (f) inexperience in the practice of law;
   (g) character or reputation;
   (h) physical disability;
   (i) mental disability or chemical dependency including alcoholism or drug abuse when:
      (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
      (2) the chemical dependency or mental disability caused the misconduct;
      (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
      (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
   (j) delay in disciplinary proceedings;
   (k) imposition of other penalties or sanctions;
   (l) remorse; and
   (m) remoteness of prior offenses.

9.4   *Factors Which Are Neither Aggravating nor Mitigating.*
   The following factors should not be considered as either aggravating nor mitigating:
   (a) forced of compelled restitution;
   (b) agreeing to the client's demand for certain improper behavior or result;
   (c) withdrawal of complaint against the lawyer;
   (d) resignation prior to completion of disciplinary proceedings;
   (e) complainant's recommendation as to sanction; and
   (f) failure if injured client to complain.

## RECOMMENDATION

In consideration of the foregoing findings of fact and conclusions of law, the Review

Panel recommends as follows:

19

1.    That Respondent be suspended for one year for violations of Rules 1.15 and 5.3, W.R.Prof.Cond.

2.    That, upon issuance of the order of suspension, the foregoing press release may be issued.

3.    That Respondent be required to pay an administrative fee of $750.00 and costs of $50.00 to the Wyoming State Bar within 10 days of such order.

Dated this 19th day of January 2022.

Robert C. Jarosh, Chair
Review Panel of the Board of Profes-
sional Responsibility
Wyoming State Bar